UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
GEORGE GLEW,

                              Plaintiff,

                                                          **MEMORANDUM OF**
                 -against-                                 **DECISION AND ORDER**

CIGNA GROUP INSURANCE and,                                CV 06-1194 (ADS)
CIGNA LIFE INSURANCE COMPANY
OF NEW YORK,

                              Defendants.
------------------------------------------------------x

**APPEARANCES:**

> **LONG, TUMINELLO, BESSO, SELIGMAN
> & WERSH LLP**
> Attorneys for Plaintiff
> 120 Fourth Avenue
> P.O. Box 5591
> Bayshore, NY 11706
> By:    David H. Besso, Esq. and
>        Michelle Aulivola, Esq.
>        Of counsel

> **RUSSO, KEANE & TONER, LLP**
> Attorneys for Defendants
> Life Insurance Company of North America ("LINA") i/s/h/s
> Cigna Group Insurance and Cigna Life Insurance
> Company of New York ("CLICNY")
> 26 Broadway, 28th Floor
> New York, New York 10004
> By:    Kevin G. Horbatiuk, Esq. and
>        Matthew P. Mazzola, Esq.
>        Of Counsel

**SPATT, District Judge.**

This is a diversity jurisdiction action to recover payments allegedly due to the plaintiff George Glew ("the plaintiff" or "Glew") under an accident and sickness policy issued by the defendants Cigna Group Insurance and Cigna Life Insurance Company ("CIGNA") to the Shirley Community Ambulance Company ("Ambulance Company") for the period of 1994.

## I. BACKGROUND

According to the facts set forth in the complaint, in March 1994, while the plaintiff was performing his duties as a volunteer member of the Ambulance Company he was "stuck with a needle by a patient who was being transported" (Complaint ¶ Fourth). The plaintiff notified CIGNA of this injury. In April 2001, the plaintiff was notified that he had developed hepatitis C, cirrhosis of the liver, diabetes and other illnesses. The plaintiff contends that these serious ailments "progressed from the initial diagnosis" (Complaint ¶ Sixth), meaning from the needle incident of March 1994.

The complaint further alleges that on or about February 2005, after he was disabled from working, a claim was made to CIGNA for payment "pursuant to said policy and no payment has been made to this date." (Complaint ¶ Seventh) This law suit was brought to recover payments allegedly due under the CIGNA accident and sickness policy.

## II.    THE TRIAL

### A) The Plaintiff's Case

In 1993-1994, Nancy Marks was both a volunteer riding member in ambulances and a Commissioner for the Ambulance District in the Town of Brookhaven.  As a riding member from the early 1990s, she responded to 911 calls as an emergency medical technician ("EMT").  As Commissioner she was responsible for overseeing the Ambulance Company, including its expenses and insurance policies.

The Ambulance Company regularly rendered assistance to persons with AIDS, tuberculosis and other communicable diseases.  Therefore, there was concern for the health of the EMTs.  This problem was addressed by a protective insurance policy.  In 1993 and 1994, the Ambulance Company had a sickness and accident policy with CIGNA, covering members who contracted diseases.  In 1994, CIGNA informed the Ambulance Company that it no longer would insure the Company and bids for a new policy were obtained.

Marks had reviewed the 1994 CIGNA policy at issue.  It covered both accidental injury and sickness.  She testified that the CIGNA policy had no time frame with regard to sickness.  Marks attributes this unusual condition to the fact that "HIV takes some time to show."  The testimony of Marks, in this regard, is meaningful:

> Q.    Ms. Marks, when Mr. Horbatiuk was questioning you about notice provisions, you indicated that you had to file a notice of claim?
>
> A.    Yes, you have to file.
>
> Q.    And when you were dealing with these latent illnesses; HIV, hepatitis

C, tuberculosis – what were the policy provisions as far as those illnesses were concerned?

A.    There was no basic time frame.

        MR. HORBATIUK: Note my objection your Honor.

        THE COURT: Overruled.

A.    There was no basic time frame, because you did not know when and if you were infected, when it would show up on test results.

Q.    And when Mr. Horbatiuk asked you about the important issues; this was an important issue for the ambulance company.  Was it not?

A.    Absolutely.

Q.    This is the coverage that you sought because of the question mark as to whether in fact the illness would ever show itself?

A.    Correct.

Tr. at 42-43.[*]

    The Ambulance Company wanted to receive a new policy for post 1994 having the

same terms and coverage as the CIGNA policy.  Their major concern was sickness.  As

Marks stated in her testimony and in her deposition:

Q.    Did you review the CIGNA policy?

A..    Yes I did.

Q.    And what did it cover?

THE COURT:  I'm sorry, I didn't hear you.

_____

[*]Tr. refers to the trial transcript.

4

BY MR. BESSO:

Q . What did it cover?

A.  It particularly covered any accidental injuries, sickness. There was no time frame that was placed on the sickness. Because if you were infected - - we'll use, I guess HIV - - if you were infected with that, there is no basic time frame of when you're going to be diagnosed.

MR. HORBATIUK:  This is beyond her scope of knowledge as a lay person.

THE COURT:  Well, I don't know about that. I think it is common knowledge that people can contract HIV. And it takes quite awhile sometimes for it to show. And it is common knowledge.

Overruled.

A.  I guess I could use myself as a example.

I had been tested for TB a couple of times because I had come across some patients that had it. And I think I was actually tested two or three times within a year and-a-half time period to see if I had gotten it.

You know, so there was no time frame on it.

BY MR. BESSO:

Q.  When you were procuring this new policy because CIGNA wasn't going to cover you any further, what were the important factors that you were looking for in procuring  this new policy?

A.  It needed to be exactly the same as the old one, as the CIGNA policy.

The CIGNA policy was provided to anybody that was interested in placing a bid on it to obtain the exact same coverage that was in that existing policy.

Q.  What were the concerns of the ambulance corps in getting this new policy?

A.  One of the major concerns was sickness.

Tr. at 16-18.

In addition, in her deposition, Marks testified as follows:

Q.     Do you remember specifics about the coverage that was in effect in 1994?

A.     Well, the specifics I can remember is we had the accident policy.  We had infectious disease, which was a very big concern.  The sickness policy and the entire policy, what I remember, especially in this area, that the ambulance company serves, those particular areas were very much of concern because we did have a lot of calls that involved overdose people, that involved people that had HIV, people that just had TB, nasty sicknesses that could have been spread.  So, that was a major concern because any volunteer that would ride on an ambulance you just did not know what you were going to come across.  So, those are specifics that I remember and it still exists until today.

Plf. Ex. 5 at p. 14.

The Ambulance Company did procure a new accident and sickness insurance policy from a company called VFIS.  (Plf. Ex. 10).  This policy was effective from February 1, 1995 to February 1, 1996.  Although the VFIS policy also refers to other companies, namely, National Union Fire Insurance Company, an AIG company, and AAIC, the Court will refer to this policy as the "VFIS policy."  Significantly, Marks testified that this 1995 policy had the same terms and conditions as the 1994 CIGNA policy.  A review of the 1995 VFIS policy does reveal some relevant notice and time requirements as follows:

A.  vital first step in the successful handling of a claim is prompt and accurate notification to us of your claim.  By providing timely, relevant information concerning your organization's claim, you will assist us in serving your claim needs.  It is our hope that you will never experience the inconvenience of a claim.  If you do, you have our resources, experience and knowledge to rely upon.

ACCIDENT & SICK CLAIMS

   A.  Non-Fatal Claims –

      All non-fatal claims should be reported directly to your agent's office as soon as possible.

   To process these claims, please provide the following information:

   1.  Completed Accident Report (These forms are provided with the policy and additional forms will be provided upon request), which includes the following:

      a.  The top section must be completed and signed by the injured person, giving a clear description of the activity and circumstances surrounding the injury.

      b.  The bottom section must be completed by a fire company official (other than the injured person), certifying that the information on the report is true.

   2.  Confirmation of disability by the attending physician.  If disability persists, confirmation will be required approximately once a month.  Ongoing disability payments are made once every two weeks as disability is confirmed.  Wage verification will be needed if disability persists longer than 2 month.

                    *    *    *    *

GENERAL POLICY DEFINITIONS

<u>Covered Activity</u> - means any activity, including travel directly to and from such activity, which is a normal duty of an Insured Person, including any:

   1.  emergency response for fire suppression and rescue or emergency medical activity.

                    *    *    *    *

<u>Infectious Disease</u> - means a disease included within the list of potentially life-threatening infectious diseases, developed by the Secretary of Health and Human Services, pursuant to Title XXVI of the Public Health Service Act,

such as hepatitis, clostridium, rubella, and tuberculosis.

Sickness - means any disease, sickness, or infection of an Insured Person while coverage under the policy is in force as to the Insured Person. The Sickness must: 1) manifest itself during a Covered Activity with the result that the Insured Person interrupts his or her participation in such Covered Activity in order to receive immediate medical treatment; or 2) directly result from participation in a Covered Activity and also result in the Insured Person receiving medical treatment within 48 hours of participation in such Covered Activity. The requirement that medical treatment be received within 48 hours is waived for Infectious Diseases. Medical treatment means treatment by a Physician or at a Hospital for the Sickness.

\*   \*   \*   \*

PART IV.  WEEKLY INCOME BENEFITS

A.  TOTAL DISABILITY BENEFITS

(1) If Injury or Sickness to an Insured Person results in Total Disability, we will pay the Total Disability Weekly Income Benefit in the Schedule for the first 28 days of Total Disability.

(2) If Total Disability continues beyond 28 days, we will pay 100% of the difference between the Insured Person's Average Weekly Wage and any disability income benefits received by the Insured Person from any workers' compensation act, VAWBL, BFBL, or similar law and Other Valid and Collectible Insurance, not to exceed the Total Disability Maximum Weekly Amount shown in the Schedule, for each week the Insured Person is Totally Disabled up to a maximum of 260 weeks.

(3) The minimum benefit payable for total Disability will be the Total Disability Minimum Weekly Amount shown in the Schedule.

B.  PARTIAL DISABILITY BENEFITS

(1) If Injury or Sickness to an Insured Person results in Partial Disability, we will pay the Partial Disability Weekly Income Benefit shown in the Schedule for the first 28 days of Partial Disability.

(2) If Partial Disability continues beyond 28 days, we will pay 50% of the difference between the Insured Person's Average Weekly Wage and any disability income benefits received by the Insured Person from any workers' compensation act, VAWBL, VFBL, or similar law and Other Valid and Collectible Insurance, not to exceed the Partial Disability Maximum Weekly Amount shown in the Schedule, for each week the Insured Person is Partially Disabled up to a maximum of 52 weeks.

(3) The minimum benefit payable for Partial Disability will be the Partial Disability Minimum Weekly Amount shown in the Schedule.

C.  DISABILITY BENEFITS GENERAL

If an Insured Person is Totally Disabled or Partially Disabled for less than a week, we will pay 1/7 of the benefit otherwise payable for each full day the Insured Person is so disabled.

The amount of Total Disability Benefits or Partial Disability Benefits payable to an Insured Person who is Totally Disabled or Partially Disabled may be increased after Total Disability Benefits or Partial Disability Benefits have been paid to that Insured Person for at least 52 consecutive weeks.  The increase will equal the percentage increase, if any, in the Consumer Price Index for the preceding calendar year.  The increase will apply to either the Insured Person's Average Weekly Wage at the time of the Covered Activity which caused the Injury or Sickness, or to the Total Disability Benefit or Partial Disability Benefit, whichever results in the higher benefit to the Insured Person.  Any increase in benefits will become effective on July 1 next following the 52 week benefit period.  Successive annual increases, if any, on July 1 of each subsequent year will be compounded.

In the event that benefits are payable for both Total Disability and Partial Disability resulting from Injury or Sickness sustained while participating in the same Covered Activity, the maximum benefit period for all benefits is 260 weeks.

Periods of Total Disability or Partial Disability separated by less than five (5) years will be considered one period of disability unless due to separate and unrelated causes.

"Average Weekly Wage" means an average weekly wage determined by the

greater of: (1) the total of wages, salaries, tips, and commissions, etc., for the calendar year immediately preceding the year in which the loss occurred; (2) the average weekly wage earned in the 12 months preceding the loss; (3) the annualized weekly wage earned in the 3 months preceding the loss; or (4) for the self-employed, the amount taken from Schedule C, E, or F which is reported on page one (1) of IRS Form 1040 as net taxable income, excluding rental, investment or passive income. The Average Weekly Wage will be verified by the Insured Person's employer and/or tax records.

"Partial Disability," "Partially Disabled" means an Insured Person's inability to do one or more, but not all, of the material and substantial duties of his or her regular occupation. The Insured Person must be under the regular care of a Physician during Partial Disability.

"Total Disability," "Totally Disabled" means an Insured Person's inability to perform all material and substantial duties of his or her regular occupation. The Insured Person must be under the regular care of a Physician during Total Disability.

*   *   *   *

PART V. OPTIONAL SUPPLEMENTARY BENEFIT PACKAGE

### B.  PERMANENT PHYSICAL IMPAIRMENT BENEFIT

We will pay a Permanent Physical Impairment Benefit if Injury to an Insured Person results in a Permanent Physical Impairment and the Insured Person participates in an approved physical rehabilitation program (if his or her physical condition so warrants).

<u>To Determine the Benefit Payable</u>

The Insured Person's Permanent Physical Impairment will be assigned an impairment value by an examining Physician. This value will be expressed as a percentage in relation to the whole person. The impairment value will be determined by the most current edition of the American Medical Association's "Guide to the Evaluation of Permanent Impairment." (In the event the referenced guide ceases to be published, we will use another appropriate measurement of impairment values with the prior approval of the Superintendent of Insurance). This percentage value will be applied to the Permanent Physical Impairment Benefit Principal Sum shown in the

Schedule to determine the Permanent Physical Impairment Benefit dollar amount payable under this policy.

Any Permanent Physical Impairment Benefit paid or payable hereunder will be in addition to any Accidental Dismemberment Benefit paid or payable under the Policy. However, in no event will the total mount of benefits payable as a result of any one accident exceed 100% of the largest Principal Sum shown in the Schedule for these Benefits.

If the Insured Person has a physical impairment prior to the time of loss, the impairment value that represents the pre-existing condition will be deducted from the Permanent Physical Impairment evaluation.

C. WEEKLY PERMANENT PHYSICAL IMPAIRMENT BENEFITS

We will pay Weekly Permanent Physical Impairment Benefits if: 1) Injury to an Insured Person results in a Permanent Physical Impairment; and 2) it is determined that the Insured Person has a Permanent Physical Impairment percentage value of 50% or greater for purposes of the Permanent Physical Impairment Benefit. This Weekly Permanent Physical Impairment Benefits will begin in the 261st week from the date of participation in the Covered Activity which caused the Injury and will continue to be paid weekly for the remainder of the Insured Person's lifetime.

The Weekly Permanent Physical Impairment Benefit amount will be determined by multiplying the Weekly Income Benefit amount payable on the 29th day of Total Disability, as determined under Weekly Income Benefits section of this policy, by the percentage value of the Insured Person's Permanent Physical Impairment

Example: If the Total Disability Weekly Income Benefit payable on the 29th day of Total Disability is $600.00 and the Insured Person's Permanent Physical Impairment percentage value is 70%, the lifetime Weekly Permanent Physical Impairment Benefit amount would be $420 per week ($600 x 70% = $420).

Weekly Permanent Physical Impairment Benefits will be paid in addition to any benefits paid or payable under this policy.

*     *     *     *

Notice of Claim: <u>Written notice of claim must be given to us within 30 days after a covered loss occurs, or as soon as reasonably possible</u>. The notice can be given by or on behalf of the Insured Person to us at our executive office or to one of our authorized agents.

Claim Forms: <u>When we receive the notice of claim, we will send the claimant forms for proof of loss. If these forms are not furnished within 15 days, the claimant will meet the proof of loss requirements by giving us written proof of the nature and extent of the loss within the time limit stated in the "Proof of Loss" Section</u>.

Proof of Loss: If this policy provides for periodic payment for a continuing loss, we must be given written proof within 90 days after the end of each period for which we are liable. For any other loss, we must be given written proof within 90 days after that loss. If it was not reasonably possible to give written proof in the time required, we will not reduce or deny the claim for this reason, if the proof is filed as soon as reasonably possible.

*     *     *     *

Time Payment of Claims: When we receive written proof of loss, we will pay any benefits due within 45 days of receipt of such written proof. Benefits that provide for periodic payment will be paid at least monthly. When our liability ends, we will pay any remaining balance as soon as we receive written proof of loss.

*     *     *     *

<u>Physical Examination and Autopsy: We, at our expense, have the right to have the Insured Person examined as often as reasonably necessary while a claim is pending</u>. We may also have an autopsy performed unless prohibited by law.

Plf. Ex. 10 (emphasis supplied).

Marks described the document retention policy of the Ambulance Company, which

is to hold the documents for seven years and then shred them. Marks also described the

plaintiff's functions at the ambulance company. He was the business manager and basically, ran the Company for thirteen to fifteen years. Everyone in the Company knew of the "needle stick" incident and was concerned about him, especially because the incident occurred in a "not nice" area.

On cross-examination, Marks reiterated her testimony that the CIGNA policy contained no time periods with respect to sickness and had no requirements as to when to report a sickness claim or to give notice. In particular, she testified that the policy had no time frame for filing a notice with the carrier; no time frame as to HIV; no time frame for infectious diseases; and no provision requiring notice "until the disease manifests itself." She stated that one had to make a claim when disabled. However, she testified that there was a time limit for injuries such as a sprained ankle. Her testimony in this regard, is as follows:

> Q.  Ms. Marks, is it your testimony that there was absolutely no time frame for any injury that would be sustained by volunteers under the CIGNA policy?
>
> A.  Any infectious disease, any sickness.
>
> Q.  So if, so your testimony is that with regard to infectious disease, there is a special requirement under the policy that you do not have to provide notice until the disease manifests itself?
>
> A.  No, you don't have to provide a notice until it comes to be.
>
> Q.  My question is: is that only with regard to infectious diseases under the CIGNA policy?
>
> A.  I believe it was.
>
> Q.  So that the Shirley Volunteer Ambulance attendant hurt his, tripped

exiting the ambulance?

A.    Yes.

Q.    And sustained a sprained ankle; did that person have to submit the claim to CIGNA based upon your knowledge of the policy as it existed in 1994 – did they have to submit that within a specified time period?

A.    Yes, I believe so.

Tr. at 43-44.

George Mills Glew, Jr. is the plaintiff in this action. He testified that he presently receives disability benefits and has been disabled from December 20, 2004. Glew recounted his employment history, including his training as a New York State Certified EMT and as a paramedic. Glew was a volunteer ambulance attendant with the Shirley Ambulance Company for approximately 34 years. He was also involved with the Ambulance Company in administrative duties and was a member of the Board of Directors for eight years from 1980. Glew was involved in every aspect of the administrative duties in the Ambulance Company including the procurement of insurance policies and the handling of accident and sickness claims. He made sure to file claims in all cases where a member was injured.

The Ambulance Company had an accident and sickness policy with CIGNA from the mid-1970s to the end of 1994. In the years 1983 and 1984, it was discovered that AIDS could be contracted by "needle sticks." It was a major scare in the medical community. Accordingly, the Ambulance Company made sure that its members had coverage for infectious diseases, such as hepatitis. Glew had medical training and paramedic training at

14

Stony Brook and he had 30 to 35 hours of training in the AIDS Unit. He received extensive training in AIDS, hepatitis and infectious diseases. He was taught to wear gloves and goggles when handling patients with infectious diseases.

Glew was involved in procuring an infectious disease insurance policy for the Ambulance Company. The Ambulance Company purchased the accident and sickness insurance policy from CIGNA through an insurance agency or brokerage called Corwin-Barber. In particular, he dealt with Michael McClure, a salesman with Corwin-Barber. Glew recalls that he discussed this policy annually with McClure and a representative of CIGNA.

Glew recalls that the 1994 policy included a sickness provision, similar to the accident provision which covered an illness incurred in the line of duty. Glew testified that the policy specifically listed AIDS, hepatitis and tuberculosis in the policy. As to latent diseases such as AIDS or hepatitis or infectious diseases, the claimant had to notify the carrier. Glew testified that "there may have been a time period," but it did not matter because he notified the carrier within 72 hours. As to notification, Glew testified to the following: "And then they would specifically list that language that said the nature of the infectious diseases is such that they may not surface for years to come. There is an indefinite time period for receiving this benefit. . . . The policy stated that there was an indefinite time for a claim."

(Tr. at 69, 75).

15

On March 27, 1994, Glew was receiving field training upgrade at Mary Immaculate Hospital Center in Jamaica, Queens.  On that date, Glew responded in a Company ambulance to a dimly lit house in South Jamaica, Queens, where he found an unconscious male, who was barely breathing.  One medic started the man's breathing and Glew was to administer drugs to counteract his suspected drug overdose.  Glew set up his IV equipment, put on his gloves and inserted the IV catheter in the man's right arm.  Glew was kneeling below the man's right arm.  He placed the needle over the man's right shoulder and eventually started to administer the drugs.  The drugs worked and the man became conscious and was flaying about.  At some point, Glew felt a prick in his right index finger and saw that the needle was lodged in his right index finger.  The needle pierced the glove and his skin and his finger was bleeding.  Glew applied alcohol and a band-aid to the finger.

The patient was brought to Mary Immaculate Hospital in Queens and Glew sought immediate medical aid at the hospital.  He was given a tetanus shot and placed on AIDS protocol drugs "prophylactically."  One of the drugs was Azidothyomidine ("AZT") and it was "absolutely horrendous."  He took those drugs for one month and was sickened.  He was told to undergo routine lab work and be seen again at three months, six months and 12 months, and annually he would be screened for all infectious diseases from AIDS to hepatitis.  On March 30, 1994, three days after the "needle stick" incident described above, Glew sent written notice by letter to CIGNA (Plf. Ex. 35).  The letter stated:

CIGNA Insurance Company
Claims Department

16

300 Sibley Tower Bldg.
Rochester, NY 14604
Re: Notice of Injury Policy number VFP002252
Dear Sirs:

This is to put you on notice that I have suffered an injury under the above mentioned policy number VFP002252 held by Shirley Community Ambulance Co., Corp. Attached you will find one of your claim forms completed as per your instruction and copies of my worker's compensation forms that have been filed.

Specifically on March 27, 1994 while acting as a volunteer ambulance worker with Shirley Community Ambulance I suffered a needle stick injury with a used needle while treating a patient at a known drug location for a drug overdose. At the time I was treated for this at the Hospital.

At this time I am not losing anytime from work but wish to establish a claim since medical problems from needle stick injuries do not manifest themselves for years to come and if I ever need to collect benefits under this policy I can.

If you have any questions please feel free to contact me.

Very truly yours,

George Glew Jr.

cc: Michael McClure, Scott Corwin Insurance Agents

Glew then related the medical illnesses he subsequently suffered, allegedly as a result of the March 27, 1994 "needle stick." In March 2001, some seven years later, he felt effects including fatigue. A doctor did laboratory tests. He was diagnosed with hepatitis C. Between 2001 and 2004 the hepatitis condition manifested itself further. He suffered from fatigue, loss of appetite, muscle and joint pain, gastrointestinal problems, night sweats and insomnia. He received treatment at Mount Sinai Hospital in Manhattan. He was treated with

drugs including interferon injections once a week and ribavirin once a day. The drug treatments did not work. At that time, Glew was also diagnosed with cirrhosis of the liver, diabetes, hypertension, portal hypertension and arthritis affecting the muscles and joints. Glew testified that he is still suffering from these illnesses.

Glew testified that as a result of his illnesses he could work only to the end of 2004. Glew last worked on December 20, 2004. In a Workers' Compensation decision dated June 10, 2005, Judge Leo Kornfeld held:

> The claimant George Glew Jr. had an injury in the line of duty as a volunteer ambulance worker amended to include hepatitis C and cirrhosis of the liver. Yannacone (his former attorney) is discharged and removed from notice. Medical treatment and care, as necessary, for established sites of injury and/or conditions, is authorized. The carrier/self insurer is directed to reimburse the claimant for medical and travel expenses in the amount of $1,964.86 subject to audit. No further action is planned by the Board at this time.

Plf. Ex. 34.

In addition, certified copies of the Workers' Compensation records are in evidence (Plf. Ex. 36). A review of the plaintiff's Workers' Compensation file contains relevant and important evidence on the issue of the diagnoses of plaintiff's illnesses and the issue of causation, which will be addressed in the causation portion of this decision. In chronological order, the medical records in the Workers' Compensation file reveal the following sickness and causation evidence:

1. A response from Dr. Suzane Fields, internist, dated April 19, 1994, states that there is a history of pre-existing disease, namely "past h/o hepatitis" - meaning a past history

of hepatitis, prior to the "needle stick" incident.

2.     Report of Dr. Robert A. Slutsky, Medical Director and Physician of the Shirley Community Ambulance Company, dated October 18, 2001, stating, "It is my opinion that the origin of this chronic hepatitis could be directly ascribed to the 'dirty' needle puncture in 1994."

3.     Report of Dr. Leona Kim-Schleiger of Mount Sinai Hospital, dated November 4, 2002, stating that Glew has "hepatitis C - induced liver disease with a biopsy showing stage 4 cirrhosis" with evidence of portal hypertension. No causation was mentioned in her report.

4.     Report of Independent Medical Examiner Dr. Seymour Alter, dated January 30, 2003. While the plaintiff "denies any previous history of hepatitis," this statement is contradicted later in the report of Dr. Alter as follows:

DIAGNOSIS/CAUSAL RELATIONSHIP:

The claimant has chronic liver disease secondary to hepatitis C infection with cirrhosis. From the information available, there is a possibility that this chronic liver disease is causally related to either his past history of hepatitis more than 20 years ago, or causally related to the contaminated needle stick in 1994. The time course over which he developed chronic liver disease with cirrhosis could be consistent with either of these two possible etiologies. Obtaining his past medical records, especially in regard to previous liver function tests, would be pertinent in elucidating which of these two possible etiologies is related to his current development of chronic liver disease.

If the claimant contracted Hepatitis C more than 20 years ago, he may have had minimal or no liver enzyme abnormalities over this period of time. If he did contract Hepatitis C at that earlier date, it may well have been undetectable, unless a specific test for Hepatitis C antibody was done.

In summary, from the information available to me, it can not be stated that his chronic liver disease, with reasonable certainty, is attributable to his needle stick.

5.     A Workers' Compensation medical form signed by Dr. Bibi N. Zainul of the South Brookhaven Medical Center, dated November 30, 2004, in which she stated that the "needle stick" was the competent producing cause of her findings and his complaints.

6.     A second Workers' Compensation medical form signed by Dr. Bibi N. Zainul, dated January 11, 2006, stating that there is no history of pre-existing injury.

7.     A comprehensive medical report by Dr. Carl B. Friedman for the Special Funds Conservation Committee, dated March 21, 2005.  In a five-page report, signed under "penalty of perjury," Dr. Friedman reviewed Glew's entire medical file.  Among the documents he reviewed were the following:

> 6. I reviewed a short progress note dated 3/29/94.  The record indicates the patient had no significant past medical history except for an episode of hepatitis 20 years ago.  The record indicates he had a needle stick injury two days back as a paramedic while putting an intravenous into an unconscious patient performed at a crack joint.  The patient was immediately started on AZT 100 mg 5x/day. He was seen by an HIV counselor on 3/28/94.  He had developed positive hepatitis C serology when evaluated in the year 2000. (Whether or not there was hepatitis C serology or Hep B positivity following an episode of hepatitis in the 50's is unknown).

> 7. I reviewed the report submitted by Dr. Robert Slutsky, date of evaluation January 29, 2003.  He reported the injury because of a needle stick on March of 1994.  It was allegedly used on an individual with a history of IV drug abuse.  He was initially treated with AZT for HIV prophylaxis.  AZT was continued for a period of one month.  In 1995 he was first found to have elevated liver enzyme.  Hepatitis C antibodies were evaluated in the year 2000 and were found to be positive.

Dr. Slutsky concludes the patient has chronic liver disease with the possibility of chronic liver disease related to either his past history of hepatitis 20 years ago or a causally related condition associated with a contaminated needle stick in 1994.

\* \* \* \*

CAUSALITY:

His needle stick occurred on 3/28/94 and may have been the competent cause of him developing hepatitis C with development of cirrhosis. The effect of his previous episode of hepatitis may indeed have been the initiating cause of hepatitis C infection. I cannot determine the initial cause of his hepatitis C since there is no record of serology or abnormal liver function associated with episode of hepatitis which occurred in 1950.

APPORTIONMENT:

No apportionment can be made.

In addition, Glew received a total Social Security disability award (Plf. Ex .16);

which decision stated in part:

**ISSUES**

The issue to be determined in this case is whether the claimant is "disabled" within the meaning of the Social Security Act.

**EVALUATION**

Upon evaluation of the evidence, the Administrative Law Judge finds that the claimant is "disabled" within the meaning of the Social Security Act.

The claimant, age 54, filed an application for a period of disability and disability insurance benefits on May 27, 2005, alleging disability since December 20, 2004 because of liver disease with hepatitis and cirrhosis, diabetes and hypertension. The claimant has met the special insured status requirements of the Act and is fully insured through December 31, 2009.

\*     \*     \*     \*

Review of the medical record reveals that the claimant has a history of liver disease. He developed hepatitis C, after a needle stick while working as an emergency medical technician. A liver biopsy on June 13, 2002, showed grade 2 to 3 periportal inflammation with necrosis and stage 4 cirrhosis with hepatitis (Ex. 4F).

\*     \*     \*     \*

The Administrative Law Judge has also considered the opinion of the State Agency disability analyst, but does not accord it significant weight as the analyst is not a physician.

\*     \*     \*     \*

The evidence established that the claimant has severe liver disease with chronic fatigue, joint and muscle aches, lower extremity edema and muscle weakness. A year long treatment with Interferon did not improve his condition and he has continued abnormal liver function testing. He also has diabetes and hypertension. Based on the evidence as a whole, the Administrative Law Judge concludes that the claimant's condition would permit him to sit four to five hours per day, stand or walk less than two hours per day and lift ten pounds frequently and fifteen pounds occasionally. The claimant's residual functional capacity does not permit him to perform a full range of sedentary work. Therefore, the claimant has been under a disability since December 20, 2004, as alleged. The claimant has been in receipt of Worker's Compensation payments which may offset his disability insurance benefits.

\*     \*     \*     \*

The claimant has not engaged in substantial gainful activity since December 20, 2004.

\*     \*     \*     \*

The claimant has been under a disability since December 20, 2004, as alleged.

**<u>DECISION</u>**

It is the decision of the Administrative Law Judge that, based on the application filed on May 27, 2005 the claimant is entitled to a period of disability commencing on December 20, 2004 and to disability insurance benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

Michael S. London
Administrative Law Judge
5/11/07

Once he became disabled, Glew notified CIGNA in writing on January 17, 2005 (Plf. Ex. 37). In addition, he had e-mail correspondence with Marcy Miller, a CIGNA employee, who was the accident claim case manager for the Ambulance Company, commencing on January 10, 2005 (Plf. Ex. 30), in which he made a claim for benefits under the 1994 policy.

Glew testified that as the person that handled insurance at the Ambulance Company, he sought a policy for the year 1995, to replace the CIGNA policy, that would "maintain or upgrade the current coverages that we had." (Tr. at 86). The Ambulance Company settled on the VFIS policy for 1995. Glew testified that the disability payments under the 1995 VFIS sickness and accident policy were the same as the 1994 CIGNA policy. Those disability payments were $600 per week for the first 28 days and then $800 per week for five years for a maximum of $250,000.

On cross-examination, it was revealed that after the "needle stick" incident Glew had no physical problems and returned to work in a few days. In fact, he worked continuously

from April 1, 1994 to December 20, 2004, a period in excess of ten years. Also, Glew received no medical treatment after the emergency care at the hospital and lab work every six months. Three months after the incident, his blood work came back clean.

As to the 1995 policy with VFIS, it does not expressly refer to HIV or AIDS. However, Glew testified that it has an indefinite time period for receiving benefits; and, the risk to the carrier is open ended.

A portion of the deposition of Kevin Martin Peltz was read into the record by plaintiff's counsel. He was affiliated with the Ambulance Company in several capacities, including as a member and on the Board of Directors. He recalls the members of the Ambulance Company were concerned about AIDS "and made sure everybody was covered for infectious disease." Tr. at 109. Also, a portion of the deposition of April Peltz was read into the record. She was also a member of the Ambulance Company as an advanced EMT. She recalls that the 1994 CIGNA policy covered for infectious diseases. Ms. Peltz stated that an injured or sick person had to notify the insurance company of the claim. She testified that a lot of infectious diseases take time to show up and the sick person can report it to the carrier if notice was originally given. In addition, Peltz testified as follows:

Q.   Do you recall reviewing any provisions regarding notice requirements?

A.   If we were to file a claim we had to notify them. Yes.

Q.   Do you recall whether yo had to notify them of the claim within a certain period of time?

A.   I don't think so. Well under most circumstances, if there was an obvious injury

at the time, we would notify them immediately.  But I think under the infectious disease section, being you can't always know it's going to come up, as long as it was documented on the ambulance report, which of course, you know, on the forms that we use for after each ambulance call - - I don't believe that, because with a lot infectious diseases it doesn't show up within like the next day or so.  You know, it takes time.  That as long as they were notified, and we had the ambulance call information and everything else documented, that we would report that whenever it came up.  You know, like if they were tested, retested down the line.  And yes, it was thrown back to that call, we would then be able to then, you know, file a claim.

Tr. At 116, 117.

## B)    The Defendant's Case

The defendant's case consisted of one witness.  Vivphosia Geddis is a regional travel accident underwriter for CIGNA.  She does renewal rating and constructs customer policies.  CIGNA issued an accident and sickness policy to the Ambulance Company for a period ending in December, 1994.  CIGNA retains the policies for seven years.  She searched but could not find this policy.  However, she presented a "Blanket Accident Policy" (Plf. Ex. 11A) which had been filed with the New York State Insurance Department.  The policy was approved by the New York State Insurance Department on February 10, 1984.  Ms. Geddis testified that after this approval, CIGNA submitted no other policy to the Insurance Department.  However, the Court notes that this is an accident only policy and does not pay benefits for loss caused by sickness.

On this important subject, namely, the exemplar "Blanket Accident Policy," which was filed with the New York State Insurance Department, and is relied on by the defendants in their post-trial memorandum, the testimony of Ms. Geddis is as follows:

25

Q.     And could you just read for the record the upper right-hand corner of that exemplar.  What does that say?  It talks about sickness.

A.     It says: This accident policy – this accident only policy does not pay benefits for loss caused by sickness.

MR. BESSO: No further questions.

THE COURT: I'm sorry, what part did you read?

THE WITNESS: This is an accident only policy?

\*     \*     \*     \*

THE COURT: I have a question for you, Ms. Geddis.

When you say this is an exemplar policy of the policy that was  issued to the Shirley Ambulance Company.

THE WITNESS: Yes.

THE COURT: Well, this policy on its face has only to do with accidents, and doesn't say benefits for sickness.

THE WITNESS: Correct.

THE COURT: Is that correct?

THE WITNESS: Correct.

THE COURT: Are you indicating that the policy that was issued to the Shirley Ambulance Company by CIGNA for the year 1994 did not pay for loss caused by sickness?

THE WITNESS: I haven't seen the policy, so I can not remember. I do not know for sure.

THE COURT: Well then, you're saying that this blanket policy doesn't represent what the policy was that was actually issued to the Shirley Ambulance Company?

THE WITNESS: This is the form that we used at the time that the policy was issued.

THE COURT: This policy says on its face it doesn't cover loss caused by sickness. Doesn't it?

THE WITNESS: Correct.

THE COURT: Okay. This case that you're testifying in, involves someone who says they were made sick.

THE WITNESS: Correct.

THE COURT: And they want benefits under the sickness.

If the policy doesn't cover loss caused by sickness, if this was the policy that was issued to Shirley Ambulance, then the plaintiff can't recover. Right?

THE WITNESS: Correct.

THE COURT: And you say that this is the policy issued.

THE WITNESS: Correct.

THE COURT: So you say that the Shirley Ambulance Company, whose members treat sick people many times, would not have a policy that covered sickness?

THE WITNESS: Correct.

Tr. at 140-144.

However, in this regard the Court notes that in her sworn declaration (Plf. Ex. 11), Geddis stated that "CLICNY had issued an accident and sickness policy to Shirley Volunteer Ambulance Company . . ." Her testimony in this regard is compelling:

Q.      Ms. Geddis, could you take a look at your declaration, if you would.

Do you have that in front of you?  It is 11-A.

Did you make a declaration on behalf of CIGNA with regard to this matter?

A.      Yes.

Q.      And was that sworn to?

A.      Yes.

Q.      And when was that sworn to?  Do you remember?

A.      The date?

Q.      11/13/07, would that be correct?

A.      Yes.

Q.      Everything you said here is true?

A.      Correct.

Q.      Now I ask you to take a look at number 2, and read that to the Court. What does that say?

A.      CIGNA has issued an accident/sickness policy to Shirley Volunteer Ambulance Company.

Q.      So you issued an accident and sickness policy.  Is that correct?  That is your statement.

A.      Yes.

Q.      So where is the exemplar for the sickness policy?

A.      This is.

Q.      This one says it doesn't cover sickness?

A. Correct.

Q. And you say you issued a sickness policy. So where is it?

A. This is all that we have.

Q. That is your statement, is it not, that you issued a sickness policy?

A. Yes.

Q. This one doesn't cover sickness. Is that correct?

A. Correct.

                    \*     \*     \*     \*

Q. Anybody force you to make this statement, Ms. Geddis?

A. No.

Q. You did that voluntarily. Correct?

A. Right.

Q. Of your own free will?

A. Correct.

Q. And you stated under oath that you issued an accident and sickness policy to Shirley Community Ambulance Company. Correct?

A. Correct.

Tr. at 144-146.

In addition, the Court notes that in the defendant's answer, the defendant admitted "that at the time of this incident, the Ambulance Company was covered by LINA with an accident sickness policy." (Answer at ¶ Third). Also, in the defendant's Rule 56 Statement,

it states that, "CIGNA Life Insurance Company of New York ("CLICNY") had issued an accident and sickness policy to SVAC." (Rule 56 Statement at ¶ Third).

The Court finds that the so-called "Blanket Accident Policy" or exemplar policy (Plf. Ex. 11A) did not contain the same provisions as the missing 1994 CIGNA accident and sickness policy, and does not, in any way, bar a recovery by the plaintiff.

### III.    DISCUSSION

### A) The Burden of Proof

An insured seeking coverage under a lost or destroyed policy must prove the existence and terms of the policy by reliable and competent secondary evidence. *Burt Rigid Box Inc. v. Travelers Property Casualty Corp.,* 302 F.3d 83 (2d Cir. 2002). While there has been some dispute as to the burden of proof, in this Court's view, the proper standard is the same as other civil cases in the federal court, namely, by a preponderance of the evidence. The rule, as viewed by this Court, is stated in *Emerson Enterprises, LLC v. Crosby*, No. 03 CV 6530 2007 WL 4118299 at *7 (W.D.N.Y. Nov. 14, 2007), as follows:

> The parties agree that *Gold Fields Am. Corp. v. Aetna Cas. And Sur. Co.,* 173 Misc.2d 901, 661 N.Y.S.2d 948 (Sup.Ct N.Y. County 1997) correctly states the standard for proving the terms of a **missing** insurance **policy**. Specifically, an insured may prove the contents of a **missing** insurance **policy** using secondary evidence, and must do so by a preponderance of the evidence. *Id.,* 173 Misc.2d at 905, 661 N.Y.S.2d at 951 ("This court finds nothing unfair in holding the plaintiff to the usual preponderance of the evidence standard of persuasion where the carrier, which is in the business of selling policies, chooses to keep no records at all of those policies.")

In *Southern Union Company v. Liberty Mutual Insurance Company*, No. 06 CV 12067, 2008 WL 4530680 (D.Mass. July 24, 2008), the rules as to burden of proof and the proof of a destroyed policy were set forth:

> As previously mentioned, neither Southern Union nor Liberty Mutual have copies of the alleged policies crucial to the outcome of this litigation. This Court may fairly conclude that they are lost. Under Massachusetts law, Southern Union, the proponent of the lost insurance policies, has the burden of proving (1) the instruments were issued and (2) the terms contained in the instruments. *See Kleenit, Inc. v. Sentry Ins. Co.*, 486 F.Supp.2d 121, 125-26 (D.Mass.2007); *Markline Co., Inc. v. Travelers Ins. Co.*, 384 Mass. 139, 140, 424 N.E. 2d 464 (1981); *Employers' Liability Assurance Corp., Ltd. v. Hoechst Celanese Corp.*, 43 Mass.App.Ct. 465, 484, N.E.2d 600 (1997). Southern Union must make this showing by a **preponderance** of the **evidence**. *See Rubenstein v. Royal Ins. Co. of Am.*, 44 Mass.App.Ct. 842, 846, 694 N.E.2d 381 (1998) (explaining that a more stringent burden of proof is for those cases where "a strong likelihood that fraud, or of wrongdoing existed"); *Kleenit, Inc.*, 486 F.Supp.2d at 126 n.2 ("the **preponderance** of the **evidence** standard governs regardless [whether federal or Massachusetts law] is applied."). Besides establishing the standard of proof in Massachusetts lost policy cases, *Rubenstein* teaches "[t]hat a policy has been lost or destroyed does not mean that its existence and contents may not be reconstructed from business records, underwriter's folios, or billings of the insurance company to the insured." *Rubenstein*, 44 Mass.App.Ct. at 846, 694 N.E.2d 381.

*Southern Union,* 2008 WL 4530680 at #3; *see also Kleenit, Inc. v. Sentry Insurance Company*, 486 F.Supp.2d 121, 125-26 (D.Mass.2007) ("Under Massachusetts law, Kleenit must show by a preponderance of evidence both the existence and contents of a lost or missing policy"); *American International Life Assurance Company of New York v. Vasquez*, No. 02 CV 0141 2003 WL 548738 #4 (S.D.N.Y. Feb. 25, 2003) (assuming in New York, the standard is a preponderance of the evidence); *Employers Ins. Of Wausau v. The Derplan*

*Corp.,* No. 94 CV 3143 1999 WL 777976 (S.D.N.Y. Sept. 30, 1999) (stating at that time "the only reported New York case to have considered the standard of proof on this issue has held that the proponent of a lost policy must prove its existence and terms by a preponderance of the evidence." (Internal citation omitted) *Rubenstein v. Royal Ins. Co. of America*, 44 Mass.App.Ct. 842, 694 N.E.2d 381 (1998) (rejecting clear and convincing evidence as standard of proof in lost policy cases).

There is authority to the contrary in this circuit and elsewhere, stating that the proper standard of proof is clear and convincing evidence. *See, e.g. Archie Comic Publications, Inc. v. DeCarlo*, 258 F.Supp. 2d 315, 329 (S.D.N.Y. 2003) (citing by footnote to a number of cases in other circuits) *see also Crawford v. 733 San Mateo Co.,* 854 F.2d 1220, 1221 (10th Cir. 1988) (proof of terms must be "clear, cogent and convincing") (New Mexico law); *Rash v. Peoples Dep. Bank & Trust Co.,* 192 F.2d 470, 471 (6th Cir. 1951) (the terms of a lost agreement may not be proved "where assumed recollection of specific facts after the lapse of years taxes the credulity of the court") (Kentucky law); *Chicago, Wilmington & Franklin Coal Co. v. Menhall,* 131 F.2d 117, 120 (7th Cir. 1942) (description contained in lost deed must be proved by clear and convincing evidence) (Illinois law); *Gill v. Colton,* 12 F.2d 531, 534 (4th Cir. 1926) (the content of a lost instrument must be proved "by evidence of the clearest and most satisfactory character") (West Virginia law); *Barranco v. Kostens*, 189 Md. 94, 98, 54 A.2d 326, 328 (1947) (proof of contents of a lost instrument "must be clear and positive and of such a character as to leave no reasonable doubt as to its terms and

conditions"); 75A N.Y. JUR.2D, Herb Fuerhate *Lost and Destroyed Instruments and Records* § 38 (2000); 4 Caroline N. Brown, Corbin on Contracts § 12.10, at 828 (rev. ed. 1997).

However, as stated above, in this Court's view there is no reason to depart from the almost universally accepted general rule, that the burden of proof in this civil case should be by a preponderance of the evidence.

### B) <u>The Rule on Secondary Evidence</u>

In this case, neither party has been able to produce the CIGNA 1994 insurance policy at issue. Each party has destroyed the pertinent document as part of their general document retention procedures. Thus, plaintiff Glew must resort to secondary evidence to prove his claim of sickness/disability coverage for the years in question.

Federal Rules of Evidence (Fed.R.Evid.) 1002 provides that "to prove the content of a writing . . . the original writing . . . is required." Fed.R.Evid. 1004 governs the admissibility of secondary evidence to prove the contents of a writing when the original is not available and provides:

> Rule 1004. Admissibility of Other Evidence of Contents
> The original is not required, and other evidence of the contents of a writing . . . is admissible if --
> (1) Originals lost or destroyed. All originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith . . ."

This Rule allows admission of secondary evidence offered by a party who destroyed the original as long as the action was not taken in bad faith. *See Estate of Gryder v.*

33

*Commissioner of Internal Revenue*, 705 F.2d 336 (8th Cir. 1982). Here, the Court finds that the original CIGNA policy for the year 1994 has been destroyed by both parties to the policy, and there is no bad faith in this regard.

When this condition is satisfied, as it is in this case, the destroyed policy may be proved by "other evidence" than the "original" without offending the Best Evidence Rule. However, the intent of Rule 1004 was not to overcome other exclusionary provisions, including hearsay objections. In the Advisory Committee's Note to Rule 1004, it is stated that "the rule recognizes no 'degrees' of secondary evidence." Fed. R. Evid 1004 advisory committee note. Oral testimony has been admitted as secondary evidence, if the original is lost or destroyed. For example, "[b]ecause the district court . . . could admit any form of secondary testimony once the original evidence was destroyed and because there was no evidence of bad faith, the agent's oral testimony was properly admitted." *United States v. Billingsley*, 160 F.3d 502, 505 n.2 (8th Cir. 1998).

For example, in a breach of warranty action against a seller of insulation, it was proper to permit the buyer to testify to the contents of seller's promotional brochure, which was destroyed in the fire, despite the availability of a similar brochure. *Neville Const. Co. v. Cook Paint and Varnish Co.,* 671 F.2d 1107, 1109 (8th Cir. 1982). In a criminal case, a police officer could testify to the contents of a lost note written by the defendant, although a typed copy existed. *United States v. Standing Soldier,* 538 F.2d 196, 202-03 (8th Cir. 1976), cert. denied, 429 U.S. 1025, 97 S. Ct. 646, 50 L.Ed.2d 627 (1976).

Thus, as stated by the authoritative text Federal Evidence by Mueller and Kirkpatrick, 5 Federal Evidence § 10.26, if the original policy is lost or destroyed, without bad faith, the proponent – in this case the plaintiff – may offer testimony describing the content of the policy, by a witness who saw and read the policy. *See Schozer v. William Penn Life Ins. Co. of New York*, 84 N.Y. 2d 639, 620 N.Y.S.2d 797 (1994) (where the original x-ray was lost, all "competent secondary evidence" was admissible to prove its content); *see also Neville Const.,* 671 F.2d at 1109 (rejecting an objection to the plaintiff's testimony describing a brochure where the original was lost in  a fire).  But *see*, *United States v. Wells*, 262 F.3d 455, 460-463 (5th Cir. 2001) (holding that it is reversible error to admit testimony based on recollection of calendar entries two years earlier, reflecting drug transactions by date, amount and buyer after the calendar was destroyed because admitting this testimony would amount to "an end around the rule against hearsay").

In particular, relevant to this case, when a lost or destroyed insurance policy is involved, the terms of the policy can be shown by secondary evidence. *Biterminous Casualty Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130 (5th Cir 1992) .  This means that the secondary evidence requires evidence of the <u>policy terms</u>, not just of the existence of the policy. *Id.* at 1132.  In *Biterminous Casualty* the district court used a specimen policy introduced by the plaintiff as evidence of the terms of the lost policies.  In *Phoenix Insurance Company v. Nationwide Mutual Insurance Company,* 335 F.Supp. 671 (D.C. Mont. 1972), a vital endorsement was missing.  The Court held, that the terms of the endorsement were

shown by a photograph kept by the general agent. In addition, the connection between the endorsement and the policy was supplied by witnesses testimony. This is a good example of reliable and competent secondary evidence.

### C) <u>The Secondary Evidence in this Case</u>

The secondary evidence offered by the plaintiff in this case was (1) the testimony of Nancy Marks that she had reviewed the CIGNA policy at issue, and it covered and had no time frame with regard to sickness; (2) the 1995 accident and sickness policy with VFIS, together with the testimony by Marks that this VFIS policy had the same terms and conditions as the 1994 CIGNA policy, namely an indefinite period of time for receiving benefits as a result of sickness, with an open-ended risk to the carrier; (3) Glew's testimony that there "may have been a time period" but it did not matter because he notified the carrier in writing in 72 hours; and (4) the testimony by April Peltz that she recalled that the CIGNA policy covered infectious diseases; that an injured or sick person had to notify the insurance company and the sick person can make a subsequent claim based on the original notice.

The defendants' only witness, Vivphosia Geddes, testified that the "Blanket Accident Policy," Plf. Ex. 11A, was an "accident only policy." The Court has already made a finding that the so-called "Blanket Accident Policy" did not contain the same provisions as the 1994 CIGNA accident and sickness policy. The Court therefore finds that this "accident only" policy could not be secondary evidence of the 1994 CIGNA "accident and sickness" policy at issue in this case.

While the Rules recognize no "degrees" of secondary evidence, this evidence is subject to an attack by the opposing party not as to admissibility but to the weight. *United States v. Gerhart*, 538 F.2d 807, 809 (8th Cir. 1976) ("Fed.R.Evid. 1004 'recognizes no degree of secondary evidence,' so the proponent may prove contents of writing by any secondary evidence 'subject to an attack by the opposing party not as to admissibility but to the weight'"). As stated in *Burroughs Welcome Co. v. Commercial Union Insurance Co.*, 632 F.Supp 1213, 1223 (S.D.N.Y. 1986), "Defendant is entitled to attack the sufficiency of the secondary evidence, but this attack 'goes not to the admissibility but to the weight of the evidence and is a matter for the trier of fact to resolve.'" *See also Weinstein's Evidence Manual* § 1004-5.

The Court now resolves the "weight" of the secondary evidence offered by the plaintiff, and in this regard also determines the credibility of the witnesses.

The Court finds that the plaintiff has established, by a preponderance of the evidence, that the 1994 CIGNA accident and sickness policy, at issue in this case, had similar terms and provisions as the VFIS 1995 policy (Plf. Ex. 10), and corroborates the "no time line" aspect of the CIGNA policy. In this regard, the Court accepts as credible secondary evidence, the testimony of Nancy Marks, a Commissioner of the Ambulance District in the Town of Brookhaven. She testified that she reviewed the 1994 CIGNA sickness and accident policy and it has no time frame with regard to sickness; no time frame for infectious diseases; and no provision requiring notice "until the disease manifests itself." Also, Marks

testified that the 1995 VFIS policy had the same terms and conditions as the 1994 CIGNA policy at issue. In addition, the Court credits the testimony of the plaintiff that the 1994 policy specifically listed hepatitis in the policy; that the claimant had to notify the carrier of any incident that could produce an infectious disease; and there was "an indefinite time period for receiving this benefit."

The Court finds that the material terms and provisions of the CIGNA policy, at issue, similar to the VFIS policy, are as follows:

<u>General Policy Definitions</u>

<u>Covered Activity</u> - means any activity, including travel directly to and from such activity, which is a normal duty of an Insured Person, including any:

> 1. emergency response for fire suppression and rescue or emergency medical activity.

*    *    *    *

<u>Infectious Disease</u> - means a disease included within the list of potentially life-threatening infectious diseases, developed by the Secretary of Health and Human Services, pursuant to Title XXVI of the Public Health Service Act, such as hepatitis, clostridium, rubella, and tuberculosis.

*    *    *    *

<u>Sickness</u> - means any disease, sickness, or infection of an Insured Person while coverage under the policy is in force as to the Insured Person. <u>The Sickness must: 1) manifest itself during a Covered Activity with the result that the Insured Person interrupts his or her participation in such Covered Activity in order to receive immediate medical treatment; or 2) directly result from participation in a Covered Activity and also result in the Insured Person receiving medical treatment within 48 hours of participation in such Covered Activity. The requirement that medical treatment be received within 48 hours is waived for Infectious Diseases. Medical treatment means treatment</u>

by a Physician or at a Hospital for the Sickness.

*    *    *    *

PART IV.  C.  DISABILITY BENEFITS GENERAL

If an Insured Person is Totally Disabled or Partially Disabled for less than a week, we will pay 1/7 of the benefit otherwise payable for each full day the Insured Person is so disabled.

The amount of Total Disability Benefits or Partial Disability Benefits payable to an Insured Person who is Totally Disabled or Partially Disabled may be increased after Total Disability Benefits or Partial Disability Benefits have been paid to that Insured Person for at least 52 consecutive weeks.  The increase will equal the percentage increase, if any, in the Consumer Price Index for the preceding calendar year.  The increase will apply to either the Insured Person's Average Weekly Wage at the time of the Covered Activity which caused the Injury or Sickness, or to the Total Disability Benefit or Partial Disability Benefit, whichever results in the higher benefit to the Insured Person.  Any increase in benefits will become effective on July 1 next following the 52 week benefit period.  Successive annual increases, if any, on July 1 of each subsequent year will be compounded.

In the event that benefits are payable for both Total Disability and Partial Disability resulting from Injury or Sickness sustained while participating in the same Covered Activity, the maximum benefit period for all benefits is 260 weeks.

Periods of Total Disability or Partial Disability separated by less than five (5) years will be considered one period of disability unless due to separate and unrelated causes.

*    *    *    *

"Total Disability," "Totally Disabled" means an Insured Person's inability to perform all material and substantial duties of his or her regular occupation. The Insured Person must be under the regular care of a Physician during Total Disability.

*    *    *    *

## PART V. C.  WEEKLY PERMANENT PHYSICAL IMPAIRMENT BENEFITS

We will pay Weekly Permanent Physical Impairment Benefits if: 1) Injury to an Insured Person results in a Permanent Physical Impairment; and 2) it is determined that the Insured Person has a Permanent Physical Impairment percentage value of 50% or greater for purposes of the Permanent Physical Impairment Benefit.  This Weekly Permanent Physical Impairment Benefits will begin in the 261st week from the date of participation in the Covered Activity which caused the Injury and will continue to be paid weekly for the remainder of the Insured Person's lifetime.

The Weekly Permanent Physical Impairment Benefit amount will be determined by multiplying the Weekly Income Benefit amount payable on the 29th day of Total Disability, as determined under Weekly Income Benefits section of this policy, by the percentage value of the Insured Person's Permanent Physical Impairment

Example: If the Total Disability Weekly Income Benefit payable on the 29th day of Total Disability is $600.00 and the Insured Person's Permanent Physical Impairment percentage value is 70%, the lifetime Weekly Permanent Physical Impairment Benefit amount would be $420 per week ($600 x 70% = $420).

Weekly Permanent Physical Impairment Benefits will be paid in addition to any benefits paid or payable under this policy.

*    *    *    *

Notice of Claim: Written notice of claim must be given to us within 30 days after a covered loss occurs, or as soon as reasonably possible.  The notice can be given by or on behalf of the Insured Person to us at our executive office or to one of our authorized agents.

Claim Forms: When we receive the notice of claim, we will send the claimant forms for proof of loss.  If these forms are not furnished within 15 days, the claimant will meet the proof of loss requirements by giving us written proof of the nature and extent of the loss within the time limit stated in the "Proof of Loss" Section.

Proof of Loss: If this policy provides for periodic payment for a continuing loss, we must be given written proof within 90 days after the end of each period for which we are liable. For any other loss, we must be given written proof within 90 days after that loss. If it was not reasonably possible to give written proof in the time required, we will not reduce or deny the claim for this reason, if the proof is filed as soon as reasonably possible.

A review of the policy provisions of the 1995 VFIS policy, similar in terms to the 1994 CIGNA policy, reveals no date or time limitations that would preclude the plaintiff from pursuing this claim for his illnesses. His "needle stick" incident was a "covered incident" under the terms of the policy; his hepatitis was an infectious disease under the policy terms; he did receive immediate medical treatment at a hospital, within 48 hours; he sent written notice to CIGNA on March 30, 1994, three days after the "needle stick" incident; he attached a completed claim form in his March 30, 1994 letter; he gave written notice to CIGNA when illnesses caused him to be disabled; and he was "totally disabled" within the policy provisions in that, as a result of his illnesses he was unable to perform all the material and substantial duties of his regular occupation, while under the regular care of a physician.

In this regard, the Court notes that the VFIS policy contemplates that a sickness covered by the policy may extend over a long period of time ("Period of Total Disability or Partial Disability separated by less than five (5) years will be considered one period of disability unless due to separate and unrelated causes"). It is perfectly plausible, that the Ambulance Company would seek this type of open-ended policy because of the nature of the work they were doing and the clear possibility of contracting latent diseases. With

reasonable certainty, EMT ambulance attendants who come in contact with infectious diseases with latent features would require this type of open ended sickness insurance policy.

Accordingly, the plaintiff has established, by a preponderance of the evidence, that the 1994 CIGNA policy, by its terms, would provide him with disability payments for his condition of inability to work as of December 20, 2004. In addition, the Court finds that the plaintiff notified CIGNA of the "needle stick" injury within 72 hours of the occurrence. He again notified CIGNA, in or about 2001, that he had contracted an infectious disease as a result of the "needle stick" injury, upon his being diagnosed in 2001. Therefore, the Court finds that the plaintiff has established, by a preponderance of the evidence, that the notice provisions contained in the 1994 CIGNA policy, have been proven and were complied with by Glew.

### D) <u>As to Causation</u>

Although not raised by the defendant, or pleaded as an affirmative defense, the Court has some concern with regard to the proximate cause of the hepatitis condition. A review of the Workers' Compensation file reveals that the plaintiff stated in the initial emergency room visit at the Mary Immaculate Hospital that he contracted hepatitis twenty years before. However, there is no evidence that the plaintiff had any recurrence of hepatitis in the twenty year period prior to the "needle stick" incident. Also, importantly, several doctors have stated on the record that the "needle stick" was the competent producing cause of his illnesses and complaints.

There has been no defense or objection raised by the defendant on the ground of causation. However, to complete the record, the Court finds that the weight of the medical evidence is that the "needle stick" was the cause of Glew's disability illnesses. In addition, the Court also relies in part on the findings of the Workers' Compensation Board, that "the claimant, George Glew, Jr. had an injury in the line of duty as a volunteer ambulance worker amended to include hepatitis C and cirrhosis of the liver." Reviewing the evidence in the record, the Court concurs in this finding.

## IV.    CONCLUSION AS TO LIABILITY

The Court finds that the plaintiff George Glew has established that he suffers from sicknesses resulting from an injury suffered on March 27 1994, while in the line of duty at the Ambulance Company, which sicknesses have rendered him totally and permanently disabled. He is, therefore, entitled to the payment of the disability benefits set forth in the CIGNA policy.

## V.    DAMAGES - BENEFITS

As set forth above, the Court finds that the VFIS policy replaced the 1994 CIGNA policy and provided the same coverage limits and disability benefits. These benefits are set forth in the VFIS policy, as follows:

PART IV.    A. TOTAL DISABILITY BENEFITS

> (1) If Injury or Sickness to an Insured Person results in Total Disability, we will pay the Total Disability Weekly Income Benefit in the Schedule for the first 28 days of Total Disability.

(2) If Total Disability continues beyond 28 days, we will pay 100% of the difference between the Insured Person's Average Weekly Wage and any disability income benefits received by the Insured Person from any workers' compensation act, VAWBL, BFBL, or similar law and Other Valid and Collectible Insurance, not to exceed the Total Disability Maximum Weekly Amount shown in the Schedule, for each week the Insured Person is Totally Disabled up to a maximum of 260 weeks.

(3) The minimum benefit payable for total Disability will be the Total Disability Minimum Weekly Amount shown in the Schedule.

A further hearing may be necessary to compute the benefits in this case, based on the evidence already introduced at the trial.

## VI.    <u>CONCLUSION</u>

The Court finds that the plaintiff George Glew has established, by a preponderance of the evidence, that he suffers illnesses from an injury suffered while in the line of his duty as a volunteer member of the Ambulance Company.  These illnesses have rendered the plaintiff totally disabled as of December 20, 2004.  Accordingly, the Court finds that he is entitled to payment by the defendant CIGNA for total disability benefits as set forth in the VFIS policy.

To further determine these benefits, the Court directs the attorneys to be present at a conference/hearing to be held on January 5, 2009 at 1:30 p.m.

**SO ORDERED.**

Dated:  Central Islip, New York
        December 30, 2008


                        _____*/s/ Arthur D. Spatt*_____
                        ARTHUR D. SPATT
                        United States District Judge